IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KERI ERICKSON, fka Keri Warr,

                Plaintiff,

       v.

DAIMLER TRUCKS NORTH AMERICA, LLC, a
Delaware Limited Liability Company,

                Defendant.

CV-10-0132-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Keri Erickson ("Erickson"), filed this complaint in the Multnomah County

Circuit Court for the State of Oregon against her former employer, Daimler Trucks North

America ("DTNA"), alleging two claims for relief under ORS 659A.030 for sex discrimination

and retaliation.

1 - FINDINGS AND RECOMMENDATIONS

Erickson is a citizen of the State of Oregon. DTNA is a Delaware corporation with its

principal place of business in New Jersey.[1] The amount in controversy exceeds $75,000.00.

Based on diversity jurisdiction under 28 USC § 1332, DTNA timely removed the case to this

court under 28 USC § 1441.

DTNA filed a Motion for Summary Judgment (docket # 47) and, after the filing of a First

Amended Complaint, a Supplemental Motion for Summary Judgment (docket #70) against the

new allegations. For the reasons set forth below, DTNA's motions should be GRANTED in part

and DENIED in part.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law." The moving

party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986). Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but

only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047,

1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely

colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*,

493 US 809 (1989) (emphasis in original) (citation omitted).

---

[1] Erickson's First Amended Complaint lists DTNA's principle place of business as Portland, Multnomah County, Oregon. However, DTNA's Notice of Removal lists its place of business as New Jersey. Given the lack of challenge by Erickson to diversity jurisdiction, this court assume the accuracy of the Notice of Removal.

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach.*, *Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

A review of the parties' submissions[2] reveals the following facts viewed in the light most favorable to Erickson, the non-movant:.

Erickson began working for DTNA on October 26, 2001. Ford-Chilton Decl., ¶ 2. In August 2006, she was promoted to the position of Warranty Analyst in the Extended Warranty Department with Dan Garner ("Garner") as her supervisor. Erickson Depo., p. 41. Adam Knobeloch ("Knobeloch") was Garner's supervisor. Knobeloch Decl., ¶ 1.

DTNA has policies prohibiting sexual harassment and requires employees to attend anti-harassment training on a semi-regular basis. Ford-Chilton Decl., ¶ 3. According to the DTNA policy:

---

[2] The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

> Harassment of employees in the workplace does not contribute to good working relations, productivity, or morale and will not be condoned or tolerated.  Any harassment, whether or not it constitutes illegal discrimination, is strictly prohibited.  Any employee who engages in harassment will be disciplined up to and including discharge.

Ford-Chilton Decl., Ex. 6, p. 1.

Under the heading "Responsibility," it adds:

**A. Employee**

 Circumstances that cause an employee to feel harassed should be immediately reported to an appropriate manager or supervisor.

If one's immediate manager or supervisor is the source of the problem, the employee should report the matter to the location Human Resources Manager, the Corporate Human Resources group in Portland or other appropriate manager (see Policy 200 and 201A).

**B. Management**

 It is the responsibility of management to ensure that harassment of employees does not occur within their area of responsibility.

Complaints from any source alleging such behavior shall be immediately investigated in accordance with Policy 201A.

*Id.*

Sometime around September 29, 2007, Garner expressed intimate feelings to Erickson, and she told him to stop talking about it.  Erickson Depo., Ex. 89 ("BOLI Complaint"), p. 1.  A few days later, Garner began criticizing her work performance.  *Id*.  He sent her several emails questioning her work.  *Id*.  When she objected to his criticism, he told her she "was so sexy [she] could make a dead man cum [*sic*]."  *Id*.  He also told her she was the love of his life and the reason he came to work every day.  *Id*.  Erickson explained that she was not comfortable with his conduct.  *Id*.

Around that same time, Garner told Knobeloch that he had confessed to Erickson that he was "in love with her" and that she did not reciprocate his feelings.  Knobeloch Decl., ¶ 2. Knobeloch instructed Garner "to keep his future interactions with [Erickson] in the workplace strictly professional and work-related."  *Id.*  Knobeloch spoke with Garner on a weekly basis to ensure that he was complying with those instructions.  *Id.*  However, due to his extensive travel during the fourth quarter of 2007, his monitoring of Garner consisted of "passing in the hallway and [having] an exchange of a few words" every week or so.  Knobeloch Depo., pp. 69-70; Garner Depo., p. 191.  He did not contact DTNA Human Resources ("HR") regarding Garner's behavior.  *Id*, p. 70.  Garner, for his part, did not perceive his conversations with Knobeloch as discipline, but only as guidance.  Garner Depo., p. 185.

On October 4, 2007, Garner met with Erickson to review and revise her annual ("LEAD") goals and told her about the plans in the department for her promotion.  Brush Decl., Ex. 1 ("BOLI Questionnaire"), p. 6.[3]  When mentioning the possibility of her leaving the department, he started to cry.  *Id*.  On October 15, 2007, Garner told Erickson that he had spoken with Sandi Biggs ("Biggs") about finding Erickson a position in her department.  *Id*, p. 6; Garner Depo., p. 154.  This angered Erickson who responded that she did not think she should be the person punished because of his feelings.  BOLI Questionnaire, p. 6.  She told Garner not to look for other jobs on her behalf and that if she wanted a different job, she would look into it.  *Id*, p. 7. On October 17, 2007, she asked Garner for a job description for her current position. *Id*.  Garner replied saying that she did not need another position, but "if [she] cannot get comfortable

_____

[3] Erickson attached a detailed time line of these incidents to the Oregon Bureau of Labor and Industries Employment Discrimination Questionnaire dated September 25, 2008.

working with him again, he sees no other realistic solution." *Id.* Erickson felt that she was the one who had to sacrifice an excellent position because of Garner's actions and emotions. *Id.*

Also during this time, Garner contacted Rod West ("West"), an employee in DaimlerChrysler Australia who was an acquaintance of Erickson. *Id.* Garner confided in West that he was in love with Erickson and that he thought the feelings were mutual. *Id.* He wanted West to explain to Erickson how easy it was to fall in love with her and that he could not help himself. *Id.* Garner asked West not to tell Erickson he had contacted him. *Id.* When Erickson learned about the telephone call, she was embarrassed both personally and professionally. *Id.*

On October 31, 2007, Garner asked Erickson about her monthly report and demanded that it get done and they meet about it. *Id.* Erickson felt this behavior was unusual as she had never had problems regarding the timeliness or quality of her work during the 14 months she worked with Garner. *Id.* She did not feel a meeting was necessary and emailed Garner that she would have the report completed by the end of the day. *Id.* She also told him that she knew he was inappropriately accessing her voicemail and contacting people, that his recent actions were over the top and scary, that he had no reason or judgment, and that she did not know what he would do next. *Id.* In response, Garner asked Erickson if she wanted a mediator and suggested Knobeloch, noting that he was aware of the situation. *Id.* He also mentioned that she might want to look for another job. *Id.*

Erickson contacted Knobeloch about Garner's behavior because she wanted to take care of the issue and move on. Erickson Depo., pp. 72-73 ("I didn't want anyone else involved if it wasn't necessary. I kept hoping it would just – that if I was direct, I just hoped it would go away.") She told Knobeloch that Garner needed some kind of counseling. *Id*, p. 74.

6 - FINDINGS AND RECOMMENDATIONS

Knobeloch explained that he had talked with Garner who "made it sound a lot less serious." *Id*, p. 73. He told Erickson that it was not "going to be a big deal" and wanted her to stay in the department. *Id.* They also discussed her promotion. *Id.* Knobeloch suggested that if Erickson could not work under Garner, then she could possibly work under his umbrella in another position and discussed the possibility of taking the issue to HR. *Id.* However, Knobebloch did not think it was a good idea to report the situation to HR because he felt that they could take care of the situation within the department. *Id*, p. 76. Initially, Erickson agreed. *Id*, p. 77. As she explained, "neither one of us thought it was a good idea to go to HR right at that point. I said that if the behavior continued that we were going – we were forced to have to go to HR, if it didn't end right – soon, within the next couple of weeks." *Id*, p. 75. She did not want to go to HR because she was:

> afraid for my career. I was afraid that once I went to HR that I
> wouldn't be able to – that I wouldn't be able to stay in that
> position, that I would be forced to have to leave the position. . . .
> Because HR is there for the company . . .I was worried that it
> would look bad . . .
> I wanted to stay where I was at, and I was afraid that if I did that,
> then it would cause so much trouble with [Garner] and so much
> trouble, you know with [Knobeloch] and within the department, I
> was hoping to just handle it internally. They were telling me that I
> had a promotion. I wanted . . . to continue down that path. It was
> the best for my career. If I filed a lawsuit, then that would kind of
> keep me from . . . being able . . . to have that position.

*Id*, pp. 75-76.

From the time Erickson rebuffed Garner's advances until the time she moved to a different department, Garner's behavior was angry, bitter or abrupt. *Id*, p. 65. Erickson

described it as a roller coaster on a regular basis which made it very difficult for her to do her job and work productively.  *Id*.

On November 1, 2007, DTNA notified its employees that 341 corporate positions were being relocated from Portland, Oregon, to Fort Mills, South Carolina, including the Extended Warranty Department.  *Id*, p. 268 & Depo. Ex. 86.

Also on November 1, 2007, Garner emailed Erickson explaining why he had contacted West, his reasons for previously checking her email, and apologizing for the situation.  BOLI Questionnaire, p. 8.  Erickson chose not to respond.  *Id*, p. 9.  On November 5 and 6, 2007, Erickson called in sick.  *Id*.  Garner attempted to access her email and also contacted her sister-in-law, Rebecca Schlaeger, inquiring about her whereabouts.  *Id*.

Erickson met with Knobeloch again on November 12, 2007, to report Garner's continued sexual harassment.  Erickson Depo., p. 86.  Knobeloch explained that he would talk with Garner after he returned from his vacation.  *Id*.  Erickson again asked that Garner go to counseling, but Knobeloch explained that he could not mandate counseling.  *Id*.  Erickson hoped that Knobeloch would be able to take care of the situation without requiring a report to HR.  *Id*, p. 90.  On November 14, 2007, Erickson emailed Knobeloch a chronology of events to date and explained:

> I would like to discuss which position you have in mind for my "transfer," what level it is and how it will affect me in terms of the move to South Carolina, any possible severance pay, retention bonus and variable pay as well as the potential for advancement within the new department.  I want to do what is best for me and what is best for the company, but hopefully not to the detriment of my career.  I have an interview with Sandi Biggs today over in Warranty.

Eggum Decl., Ex. 3, p. 1.

Erickson called Knobeloch again on November 20, 2007, because the issue was still not resolved. Erickson Depo., p. 91. Knobeloch had yet to speak to Garner. *Id.* She still hoped that Knobeloch would be able to resolve the situation. *Id.* She chose not to go to HR because she thought it would impact her chances of a promotion. *Id*, p. 92.

On December 5, 2007, Erickson applied for the position of MDI Analyst I with DTNA's Managed Dealer Inventory ("MDI") group. Ford-Chilton Decl., ¶ 4, Ex. 7. At that time, Michelle Scasny ("Scasny") was the direct supervisor for the position. *Id.*

Erickson took time off on December 7, 2007. BOLI Questionnaire, p. 10. She learned from her coworkers that Garner had been looking through her things at her desk while she was out. *Id.* This bothered Erickson, showed that Garner's behavior was not going to stop, and convinced her of the need to switch positions. *Id.* However, by doing so, she recognized that "any severance pay or retention bonus or variable pay may not be honored" and she would lose the "promotion that was promised to me by both [Knobeloch and Garner] when my position would be reclassified." *Id.*

She contacted Knobeloch on December 10, 2007, informing him of her decision to go to HR. Erickson Depo., p. 98. Though feeling she should be the one to complain to HR, she agreed that Knobeloch should make the contact. *Id.* After Knobeloch notified HR of Erickson's complaint, Ford-Chilton interviewed her. Ford-Chilton Decl., ¶¶ 5-7. Duane Watari ("Watari") from HR interviewed Garner and instructed him to cease all non-work related contact with Erickson. Watari Decl., ¶¶ 1-4. As a result of its investigation, DTNA decided to discipline Garner on December 14 and issued him a written warning on December 19, 2007. *Id*, ¶¶ 5-7.

Meanwhile Erickson complained to HR that Garner had been copying Knobeloch on his emails discussing her work performance and called her personal cell phone on December 18, 2007.  Ford-Chilton Decl., ¶ 8 & Ex. 9.

On December 20, 2007, Erickson accepted a position with the MDI department and began working there on January 7, 2008, under Scasny.  Scasny Decl., ¶¶ 2-3.  From January 7 to 23, 2008, Erickson completed some Extended Warranty tasks as a part of the traditional transition program.  *Id*, ¶ 4; Erickson Depo., pp. 148-49.  Early on in that new position, Erickson told Scasny about her complaint to HR about Garner.  Scasny Decl., ¶ 11; Erickson Depo., pp. 270-71.  On September 23, 2008, Scasny provided Erickson with an evaluation of her first nine months of work with MDI, including performance opportunities and gaps.  Scasny Decl., ¶ 5 & Ex. 18.

Erickson contacted the Oregon Bureau of Labor and Industries ("BOLI") on September 23, 2008, and completed an employment discrimination questionnaire.  BOLI Questionnaire, p. 1.  She filed a complaint with BOLI on September 26, 2008.  Erickson Depo., Ex. 89 ("BOLI Complaint"), p. 1.

Mark Epley ("Epley") was the Supply Chain Manager and supervised the MDI group among others.  Epley Decl., ¶ 1.  In January and February 2008, he was instructed to put together a workforce reduction plan and identify people in each department for the Involuntary Separation Program ("ISP") "who were expendable because of poor work performance or other business necessity."  *Id*, ¶ 3.  On January 9, 2009, he met with Scasny who identified Erickson "as a potential risk for ISP due to work performance related issued" based on her LEAD 2009 assessment.  *Id*, ¶ 4.  In the LEAD 2009 review prepared in January 2009, Scasny gave Erickson

a 95% results rating, including leadership, but also rated her as inconsistent "in comparison to managers on the same level in the past year," an unfavorable rating, and listed other performance deficiencies. Scasny Decl., ¶ 7 & Ex. 20. Scasny also reported to Epley that Erickson was not properly managing three large accounts. *Id*, ¶ 10.

In February 2009 Epley concluded that Erickson was a candidate for layoff "based on her poor LEAD 2009 review rating and input from Scasny about [her] work performance." Epley Decl., ¶ 7. In consultation with his supervisor, he decided on or about February 10, 2009, to eliminate Erickson's position in the MDI group. *Id*. On February 12, 2009, he met with the manager of the Parts Order Expedite ("POD") group and Robert McWilliams ("Williams"), who had just taken over Scasny's management duties, and discussed whether Erickson should be considered for transfer to the POE group. *Id*, ¶ 8; McWilliams Decl., ¶ 3. McWilliams provided additional feedback based on his personal observations of Erickson's poor work habits and job performance when he worked in a cubicle near her cubicle in 2007 and 2008. McWilliams Decl., ¶¶ 4-5, 9. They concluded that she "would not be a good candidate for transfer because of her poor work performance." Epley Decl., ¶ 8.. Epley learned the next day that the open position in POE would be eliminated and on March 5, 2009, selected and approved Erickson for ISP and notified HR. *Id*, ¶¶ 8-9.

Tony Tam ("Tam"), a DTNA HR specialist, reviewed the decisions for employee discharge to verify that employees were selected because of work performance or legitimate business needs. Tam Decl., ¶ 6. When he learned on March 4, 2009, that Erickson had filed a BOLI complaint, he completed an Adverse Impact-Follow-Up Analysis report the next day. *Id*, ¶ 7.

11 - FINDINGS AND RECOMMENDATIONS

> To complete the report, I made a list of the other employees in the MDI
> group with the same job as plaintiff and compared their LEAD review
> results for the last 3 years.  Plaintiff had similar ratings as the other MDI
> Analysts I's for her LEAD 2008 and LEAD 2007 reviews, but she had the
> lowest rating for the LEAD 2009 reviews.  I also spoke with Epley about
> why plaintiff had been selected for lay off.  When I spoke with Epley, I did
> not tell him plaintiff had made a complaint with BOLI.  I then accurately
> summarized my conversation with Epley in the section titled, "Detailed
> Explanation from Mgr - Why was Employee selected for ISP over other
> employees doing the same or similar job?"  Based on my analysis, I
> concluded plaintiff had been selected for lay off because she had the
> poorest work performance of all the MDI Analyst I's.

Tam Decl., ¶ 7.

On March 20, 2009, McWilliams and Tam told Erickson that her position had been

eliminated.  *Id*, ¶ 8.  Erickson filed this action on February 5, 2010.

## FINDINGS

Erickson alleges claims under ORS 659A.030 for sex discrimination and retaliation.[4]  For

the purposes of its motions, DTNA concedes that Garner subjected Erickson to sexual

harassment, but argues that the undisputed facts are insufficient for her to prevail as a matter of

law against DTNA on either claim

## I.  Sex Discrimination (First Claim)

Erickson alleges that DTNA is liable for sex discrimination under ORS 659A.030(1)(b)

because Garner's sexual harassment resulted in the loss of her scheduled promotion in Extended

Warranty and also caused her transfer or reassignment to a new position in MDI with

significantly different responsibilities.  First Amended Complaint, ¶ 9.  According to Oregon's

---

[4]  Both parties agree that because ORS 659A.030 was patterned after Title VII, federal cases interpreting
Title VII are instructive.  *See Montgomery v. J.R. Simplot, Co.*, 916 FSupp 1033, 1038 (D Or 1994); *Harris v.
Pameco Corp.*, 170 Or App 164, 176, 12 P3d 524, 532 (2000).

administrative regulations, DTNA may be liable as Erickson's employer for Garner's sexual

harassment under two circumstances:  (1) "when the harassment results in a tangible employment

action;" and (2) when the harassment results in "no tangible employment action," but the

employer either (a) "knew of the harassment" but failed to take corrective action, or (b) "should

have known of the harassment" but failed to take "reasonable care to prevent and promptly

correct" the harassment and "the complaining individual reasonably failed to take advantage of

any preventative or corrective opportunities."  OAR 839-005-0030(4) & (5).   DTNA argues that

Garner did not subject Erickson to any tangible employment action or cause any tangible

employment action to be taken against her, and, in any event, DTNA took immediate and

appropriate corrective action to remedy the harassment.

### A.  <u>When There Is A Tangible Employment Action</u>

According to OAR 839-005-0030(4):

> An employer is liable for sexual harassment by a supervisor with
> immediate or successively higher authority over an individual when the
> harassment results in a tangible employment action that the supervisor
> takes or causes to be taken against that individual. A tangible employment
> action includes but is not limited to the following:
>> (a) Terminating employment, including constructive discharge;
>> (b) Failing to hire;
>> (c) Failing to promote; or
>> (d) Changing a term or condition of employment, such as work
>> assignment, work schedule, compensation or benefits or making a
>> decision that causes a significant change in an employment benefit.

Although both a failure to promote and a change in job duties qualify as tangible

employment actions, DTNA contends that Erickson cannot prove that she had any viable

prospect of being promoted or that Garner took an official action that caused a "significant

change in an employment benefit."

1. **Failure to Promote**

To assert a claim based on a failure to promote, a plaintiff must show that she applied for a position, was rejected despite her qualifications, and the position remained open while other applications were reviewed. *Lyons v. England*, 307 F3d 1092, 1112 (9th Cir 2002). Here Erickson did not formally apply for a promotion for which she was rejected. Instead, her claim is premised on the promise of a promotion by her supervisors which failed to materialize. The denial of a promised promotion obviates the need to formally apply for and be rejected for the promotion, thus satisfying the first two elements of a failure to promote claim. The issue here is whether any promotion was promised to Erickson.

In 2007, Knobeloch was preparing to expand the Extended Warranty Department, which included the creation of a new position that would be a promotion for Erickson. Knobeloch Decl., ¶ 10. On October 4, 2007, after Erickson told Garner that she did not reciprocate his feelings, Garner told Erickson about the plans for her promotion, but also discussed transferring her to a different department. BOLI Questionnaire, p. 6. At some point, Garner told Erickson that her promotion in Extended Warranty had been approved. Erickson Depo., p. 122. Erickson ultimately transferred to MDI and was never promoted in the Extended Warranty Department.

DTNA argues that the promotion discussed with Erickson never existed because of DTNA's downsizing and move of the Extended Warranty Department to South Carolina. Knobeloch Decl., ¶ 10. Thus, Knobeloch never presented his proposal to upper-level management who needed to approve the reorganization. *Id*. As a result, Erickson "would never have had the opportunity to receive a promotion within the Extended Warranty group," and her

"replacement is still working as an Extended Warranty Analyst II and does not have an opportunity for promotion within the department." *Id*.

However, Erickson has submitted evidence which casts doubt on whether she was, in fact, denied a  promised promotion.  Her replacement in South Carolina, Ward Tolbert, was hired with a base annual salary of $60,000.  Jacobsen Depo., p. 20, Ex. 82; Suppl. Ford-Chilton Decl., ¶ 2.  This base salary was over $7,000 more than Erickson's base salary of $52,312.  Suppl. Ford-Chilton Decl., ¶ 3.  It also is nearly $3,000 more than Erickson's base salary of $57,044 in her new MDI position.  Watari Decl., Ex. 16.  DTNA argues that the difference in pay was due primarily to Tolbert's MBA degree which Erickson lacked.  Suppl. Ford-Chilton Decl., ¶ 3. However, Tolbert's salary reflects an increase in pay for the Warranty Analyst position of 14% , which is suspiciously the approximate amount of an increase promised to Erickson for the promotion.  Erickson Depo., p. 116.  Moreover, DTNA does not explain why a person with an MBA should be paid more in that particular position or why Erickson's experience should be valued less than Tolbert's MBA, or any other factors that may affect the differential in pay. Based solely on the amount of the pay increase for Tolbert, a reasonable juror could conclude that he obtained the promotion that had been promised to Erickson.

Erickson also raises a question of fact concerning the job title and code.  Knobeloch referred to both Erickson and Tolbert as an Extended Warranty Analyst II.  Knobeloch Decl., ¶ 10.  DTNA's counsel explains that this a typographical error and that both employees held the title of "Warranty Analyst."  DTNA's Reply (docket # 79), p 3, n2.  Yet Tolbert's application clearly identifies the position as "Warranty Analyst II," as does the job posting.  Suppl. Brush Decl., Ex. 1, pp. 2-3.  In contrast, Erickson's "Status Change Notification" identifies her position

as "Warranty Analyst." Brush Decl., Ex. 11. DTNA also claims that the job codes for both

Erickson and Tolbert were 1674. Suppl. Ford-Chilton Decl., Exs. 52-53. However, Erickson's

"Status Change Notification" listed her job code as 363. Brush Decl., Ex. 11. Based on these

discrepancies, a reasonable juror could conclude that Tolbert did not simply replace Erickson, but

instead was hired into an upgraded position previously promised to Erickson.

Given that Tolbert's pay increase was the same as Erickson's promised promotion pay

increase and the disparity as to the job titles and codes, Erickson has presented a genuine issue of

material fact as to whether she was denied a promised promotion. Thus, DTNA's motion should

be denied as to this claim under OAR 839-005-0030(4).

### 2. **Constructive Transfer**

Erickson argues that Garner's behavior caused her to unwillingly transfer to an

undesirable position with significantly different responsibilities. "Transfers of job duties and

undeserved performance ratings, if proven, would constitute 'adverse employment decisions.'"

*Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987). Indeed, a transfer to another job of the

same pay and status may constitute an adverse employment action. *St. John v. Employment Dev.*

*Dep't*, 642 F2d 273, 274 (9th Cir 1981). "But not every transfer adversely affects the victim's

employment." *Swenson v. Potter*, 271 F3d 1184, 1194 (9th Cir 2001) (internal citations and

quotations omitted).

DTNA contends that the MDI position was not less desirable since Erickson initiated the

transfer and received a 9% pay increase, consisting of a 5% promotion and 4% merit raise.

Watari Decl., ¶ 9, Ex. 17. And although she was critical of Scasny's management style prior to

the transfer (Erickson Depo., pp. 139-40), after her transfer, Erickson emailed an individual and

later the entire MDI department expressing her eagerness and excitement in working with them. Eggum Post-Hearing Decl., Exs. 40-42. DTNA also notes that by transferring to MDI, Erickson avoided an undesirable move to South Carolina. However, Erickson is very clear that she did not want to transfer and hoped to stay in her position in Extended Warranty. Erickson Depo., p. 90. She also believed that the pay increase was only a standard cost-of-living increase. *Id*, p. 115. At this point, the record is sufficient to create a material issue of fact as to whether the MDI position, despite its increase in pay, was less desirable due to its position and job duties.

However, this claim faces an additional obstacle. Pursuant to OAR 839-005-0030(4), an employer is liable for the tangible employment action of "[c]hanging a term or condition of employment" only if "the *supervisor* takes the action or causes the action to be taken against the individual." It is undisputed Erickson's supervisors did not transfer her to MDI. While Erickson resisted the idea of transferring to a new department initially, she was the one to initiate a transfer with HR. In fact, neither Garner nor Knobeloch had the authority to "unilaterally transfer" an employee. Suppl. Ford-Chilton Decl., ¶ 5. To overcome this obstacle, Erickson attempts to state a claim for sexual harassment based on a constructive transfer.

As DTNA correctly notes, a claim of constructive transfer has not previously been recognized by Oregon state courts or federal courts within the Ninth Circuit. However, those courts do recognize a claim for constructive discharge based on intolerable working conditions. *Jernigan v. Alderwoods Group, Inc.*, 489 F Supp2d 1180 (D Or 2007); *McGanty v. Standenraus*, 321 Or 532, 901 P2d 941 (1955). For purposes of summary judgment, this court will assume that, based on the same legal framework, Oregon will allow a claim for a constructive transfer.

17 - FINDINGS AND RECOMMENDATIONS

*See e.g. White v. Dial Corp.*, 52 F3d 329 (7th Cir 1995) (unpublished opinion) (applying

constructive discharge standard to claim of constructive transfer).

      To prove a constructive discharge, a plaintiff must show that "a reasonable person would

have felt that [she] was forced to quit because of intolerable and discriminatory working

conditions." *Huskey v. City of San Jose*, 204 F3d 893, 900 (9th Cir 2000).  Adopting this analysis

for a constructive transfer claim, Erickson must prove that she was forced to transfer due to

intolerable working conditions created by Garner's sexual harassment.  After Erickson rebuffed

Garner's advances, she states that he behaved differently, in an angry, bitter or abrupt way.

Erickson Depo., p. 65.  She described the frequency as "daily . . . . a roller coaster on a regular

basis.  I never knew what it was going to be.  It made it very, very difficult to do my job and to

show up and be able to work productively and have to deal with this person who is –  appeared to

be emotionally unstable." *Id*.  Although the "events did impact [her] on a regular basis" and took

"time away from [her] work trying to deal with him," she "strived[d] to do the very best that

[she] could" and was "able to meet the goals" of her position.  *Id*, p. 61.  However, his attempts

to micromanage her and his other behavior impacted her emotionally:

> I got to the point where I didn't want to get up in the morning and
> come to work.  I didn't want to deal with him.  I didn't know if he
> was going to be stomping around micromanaging or if he was
> going to be telling me I'm beautiful . . . . It made it difficult to
> concentrate on a daily basis on what I was supposed to be doing. . .
> I believe that the stress of having to deal with a continued sexual
> harassment would affect anybody to competently doing their job,
> so it probably did affect me.  I certainly didn't want to have to deal
> with it on a regular basis.

*Id*, pp. 120, 257.

18 - FINDINGS AND RECOMMENDATIONS

This evidence is sufficient to prove that Garner's behavior made Erickson's work environment intolerable.  Though she was able to meet her goals, his behavior affected her significantly.

However, under Title VII, an employer is only liable for supervisor harassment that results in a tangible employment action.  *Pennsylvania State Police v. Suders*, 542 US 129, 148-49 (2004); *Jernigan*, 489 F Supp2d at 1194-95.  Because a constructive discharge is not a tangible employment action, the *Ellerth/Faragher* affirmative defense is available to the employer.  *Suders*, 542 US at 140-41; *Jernigan*, 489 F Supp2d at 1195.  The *Ellerth/Faragher* affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Suders*, 542 US at 137-38, citing *Burlington Indus., Inc. v. Ellerth*, 524 US 724, 765 (1998) *and Faragher v. City of Boca Raton* , 524 US 775, 808 (1998).  This is the same defense as available to an employer under OAR 839-005-0030(5) when there is no tangible employment action.

Although Erickson may have submitted sufficient evidence that she was forced to transfer to avoid Garner's harassment, this claim must be analyzed under OAR 839-005-0030(5).

**B.  When There Is No Tangible Employment Action**

To the extent that Erickson complains of sexual harassment that does not rise to the level of a tangible employment action, such as her claim for a constructive transfer, DTNA argues that it is not liable because it took immediate and corrective action when it learned of the alleged sexual harassment.  As provided in OAR 839-005-0030(5):

19 - FINDINGS AND RECOMMENDATIONS

> When sexual harassment by a supervisor with immediate or successively
> higher authority over an individual is found to have occurred, but no
> tangible employment action was taken, the employer is liable if:
>> (a) The employer knew of the harassment, unless the employer
>> took immediate and appropriate corrective action.
>> (b) The employer should have known of the harassment. The
>> division will find that the employer should have known of the
>> harassment unless the employer can demonstrate:
>>> (A) That the employer exercised reasonable care to prevent
>>> and promptly correct any sexually harassing behavior; and
>>> (B) That the complaining individual unreasonably failed to
>>> take advantage of any preventive or corrective opportunities
>>> provided by the employer or to otherwise avoid harm.

Courts have not addressed what constitutes "immediate and appropriate corrective action"

under OAR 839-005-0030(5).  However, the Ninth Circuit's interpretation of Title VII of the

Civil Rights Act of 1964, 42 USC § 2000e *et seq*, is instructive when interpreting

ORS 659A.030.  *Harris v. Pameco Corp.*, 170 r App 164, 176, 12 P2d 574, 532 (2000).

Title VII requires employers to take immediate and appropriate corrective action that is

reasonably calculated to end the sexual harassment.  *Star v. West*, 237 F3d 1036, 1038 (9th Cir

2001); *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F3d 1475, 1482 (9th Cir 1997).  The

employer must have "exercised reasonable care to prevent and correct promptly any sexually

harassing behavior."  *Hardage v. CBS Broadcasting, Inc.*, 427 F3d 1177, 1185 (9th Cir 2005).

(quotations and citations omitted).  An employer's adoption of an anti-harassment policy and

efforts to disseminate the policy to its employees is sufficient to prove that an employer exercised

reasonable care to dissuade potential harassers from engaging in unlawful conduct.  *Id* at 1185.

"Notice of sexually harassing conduct triggers an employer's duty to take prompt

corrective action that is 'reasonably calculated to end the harassment.'"  *Swenson v. Potter*, 271

F3d 1184, 1192 (9th Cir 2001).  The reasonableness of an employer's remedy depends on its

ability to stop the harassment and to dissuade potential harassers from engaging in future

unlawful conduct.  *Hardarge*, 427 F3d at 1186 (citation omitted); *Ellison v. Brady*, 924 F2d 872,

882 (9th Cir 1991).

      The court considers the totality of the circumstances to determine whether the employer's

response to a complaint was appropriate.  *Hardage*, 427 F3d at 1186.  The employer must

conduct an investigation when it receives a complaint of sexual harassment.  *Swenson*, 271 F3d

at 1193.  Even if a plaintiff does not follow reporting requirements of the company's anti-

harassment policy, the employer may still be on notice.  In *Nichols v. Azteca Restaurant Enters.*,

256 F3d 864, 870-71 (9th Cir 2001), plaintiff's complaints to the general manager and

management was sufficient to provide notice.

      The employer also must take disciplinary action against the harasser, although it need not

label the action "discipline."  *Star*, 237 F3d at 1038-1039.  "Counseling or admonishing the

offender can constitute an adequate 'disciplinary' response."  *Id* at 1039.

> At the first sign of sexual harassment, an oral warning in the context of a
> counseling session may be an appropriate disciplinary measure if the
> employer expresses strong disapproval, demands that the unwelcome
> conduct cease, and threatens more severe disciplinary action in the event
> that the conduct does not cease. * * * If the harassment continues, limiting
> discipline to further counseling is inappropriate.  Instead, the employer
> must impose more severe measures in order to ensure that the behavior
> terminates.

*Intlekofer v. Turnage*, 973 F2d 773, 779-780 (9th Cir 1992).

### 1.  Corrective Action

      Garner started harassing Erickson on September 29, 2007, but she did not report it to

Knobeloch until October 31, 2007.  Complaint, ¶ 5; BOLI Questionnaire, p. 7.  Reporting the

harassment to Knobeloch as a supervisor was consistent with DTNA's anti-harassment policy at the time. Ford-Chilton Decl., Ex. 6. Thus, as of October 31, 2007, DTNA had notice of the harassment even though a complaint was not made to HR until December 10, 2007.

A question of fact exists as to whether Knobeloch's actions after October 31 and before December 10, 2007, were corrective and reasonably calculated to end the harassment. Knobeloch first heard of Garner's behavior on October 1, 2007, when Garner reported that he had expressed his feelings to Erickson. Knobeloch Decl., ¶ 2. Knobeloch told Garner to keep future interactions in the workplace "strictly professional and work-related" and spoke with him on a weekly basis to ensure that he was complying with his instructions. *Id.* After Erickson reported the harassing behavior to Knobeloch on October 31, 2007, he instructed Garner to immediately cease inappropriate contact with Erickson. *Id*.

However, the effectiveness of Knobeloch's monitoring of Garner is questionable. There were no formal meetings, and Garner did not perceive Knobeloch's instructions prior to the December discipline as anything more than guidance. Garner Depo., 185. Further, Knobeloch only told Garner that "if it's outside the workplace, that's your own business, but if it's in the workplace it's business." Knobeloch Depo., p. 78. He did not instruct Garner that such unwanted behavior towards a subordinate employee is inappropriate, whether in or out of the workplace.

In addition, on November 12, 2007, after Garner's inappropriate behavior continued, Erickson talked with Knobeloch again who explained that he had not yet had time to speak with Garner but would do so immediately when he returned from vacation. Erickson Depo., p. 87. Despite Knobeloch's warnings, Garner's behavior continued.

22 - FINDINGS AND RECOMMENDATIONS

DTNA contends, however, that Erickson should be faulted for delaying nearly two months before making a complaint to HR. Once that complaint was made on December 10, 2007, HR immediately began an investigation. Erickson was interviewed on the same day and explained to Ford-Chilton that she was interested in transferring because she wanted a fresh start. Ford-Chilton Decl., ¶ 7. Watari interviewed Garner on December 11, 2007 and instructed him to cease all non-work related contact and correspondence with Erickson. Watari Decl., ¶ 4. Only a few days later, Watari, Knobeloch, and Ford-Chilton concluded that Garner should be disciplined with a written warning and required to attend mandatory counseling. *Id*, ¶ 5. They did not find evidence, however, to support a finding that Erickson had been sexually harassed or that Garner had violated any of DTNA's policies. Ford-Chilton Decl., ¶ 10. On December 19, 2007, Garner received a written warning and ordered to counseling. Watari Decl., ¶ 6.

Because Erickson wanted to handle the issue without involving HR when she initially complained to Knobeloch, DTNA argues that it was under no obligation to commence an investigation until HR received the complaint, citing *Hardage*. However, in *Hardage*, the plaintiff insisted on handling the situation by himself after reporting the behavior to management and did not disclose all the details of the harassing conduct. The court determined that the overall picture showed that the employer's response was both prompt and reasonable. Here, in contrast, Erickson brought the claim to Knobeloch because she wanted him to intervene and requested that Garner receive some kind of counseling. She did not insist on handling it alone and gave a detailed description of Garner's offensive conduct. She did not report the harassment to HR based partially on Knobeloch's response and partially on her fear of the consequences. Since DTNA had notice of Garner's harassment from the time Erickson reported it to Knobeloch

on October 31, 2007, a question of fact arises as to whether the response after that date was prompt and reasonable.

Erickson also argues that the HR investigation was inadequate.  An inadequate investigation of a sexual harassment complaint does not constitute adequate remedial action. *Fuller v. City of Oakland*, 47 F3d 1522, 1529 (9th Cir 1995); *Hathaway v. Runyon*, 132 F3d 1214, 1224 (8th Cir 1997), cited by *Swenson*, 271 F3d at 1193, n9 ("An investigation that is rigged to reach a pre-determined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation").  However, Erickson has presented no evidence, other than the ultimate finding of no evidence of harassment, that the HR investigation was inadequate, rigged or performed in bad faith.

Erickson complains that Watari, who interviewed Garner, had no previous experience investigating sexual harassment complaints and no formal training.  Watari Decl, ¶ 2; Watari Depo., p. 21.  However, he received informal training prior to his employment with DTNA. Watari Depo.,  p. 22.  Erickson also argues that Watari did not provide his notes on his interview with Garner to Ford-Chilton and did not obtain all the information from Ford-Chilton's portion of the investigation.  *Id*, pp. 36-37.  Watari and Ford-Chilton, however, were HR professionals who began a prompt investigation when they learned of the harassment.  Ford-Chilton Decl., ¶ 5. Unlike in *Fuller*, 47 F3d 1522, where the harasser was not promptly interviewed or disciplined, Garner received written discipline and was ordered to complete counseling approximately nine days after HR began the investigation.

Erickson also argues that DTNA's action cannot be "corrective action" because it was not reasonably calculated to end the harassment.  Watari instructed Garner on December 11 and 14,

2007, to limit his interactions with Erickson to work-related topics.  Whether he did so is disputed by Erickson.  Erickson claims that she still experienced sexual harassment.  Erickson Depo., p. 151 ("he was still trying to ingratiate himself into my life and look for reasons to have something to do with me.").  On December 11, Erickson noticed that Garner began to micromanage her and criticize her work performance in emails copying his supervisor Knobeloch.  BOLI Questionnaire, p. 11.  On December 13, Garner emailed Erickson at her personal email address.  On December 18, Garner contacted Erickson on her cell phone.  In response, Erickson emailed Ford-Chilton that "[i]t seems that your resolution isn't working.  Not even the threat of having this on his 'permanent record' or any other disciplinary action you may have imposed seems to affect his decision making abilities when it comes to me. It's certainly not surprising me."  Ford-Chilton Decl., Ex. 10, p. 3; BOLI Questionnaire, p. 13.  Ford-Chilton replied that the meeting with Garner would occur tomorrow or the next day, which it did.  Ford-Chilton Decl., Ex. 10, p. 2; Watari Decl., ¶ 7.  While waiting for HR to discipline Garner and his behavior to cease, Erickson took the rest of the week off work to avoid interacting with him.  Ford-Chilton Decl., Ex. 10, p. 1.

Upon returning from the holiday break in January 2008, Erickson began the standard transition period between her position with Extended Warranty and MDI.  Watari Decl., ¶ 10.  On January 9, 2008, Garner contacted Erickson's new department looking for her.  BOLI Questionnaire, p. 14.  When Erickson met with Ford-Chilton  on January 11, 2008, about her concerns regarding the transition arrangement, Ford-Chilton told her to "think of Freightliner."  BOLI Questionnaire, p. 18; Erickson Depo., p. 144.  She left the meeting "angry, confused, and feeling guilty."  BOLI Questionnaire, p. 18.

25 - FINDINGS AND RECOMMENDATIONS

Thus, Erickson has submitted sufficient evidence to create a genuine issue of material fact as to whether DTNA took immediate and appropriate corrective action to end the harassment.

### 2. **Erickson's Use of Preventative or Corrective Measures**

Erickson complied with DTNA's policies by reporting the sexual harassment to Knobeloch. That she delayed taking it to HR until December 2007 does not support a contention that she failed to use preventative or corrective measures. Instead, she was assured by Knobeloch that the issue could be resolved without going to HR.

### 3. **Conclusion**

At this point, Erickson has submitted sufficient evidence that she was constructively transferred due to intolerable working conditions created by Garner's sexual harassment and that DTNA cannot avoid liability under OAR 830-005-0030(5). Therefore, summary judgment should be denied on the constructive transfer claim.

## II. **Retaliation (Second Claim)**

Erickson claims DTNA retaliated against her for objecting to Garner's behavior, reporting it to his supervisor and HR, insisting that it stop, and filing a BOLI complaint on September 26, 2008, by:

> (a) failing to promote her;
> (b) forcing her to transfer;
> (c) by Garner unfairly criticizing her performance;
> (d) by Garner micromanaging plaintiff;
> (e) by Garner excessively monitoring plaintiff;
> (f) by Garner informing plaintiff that he had inquired of another manager about the possibility of Plaintiff transferring [to] that other manager's department;
> (g) by Garner reducing the performance rating he gave plaintiff from February 2007 to February 2008

(h) by Garner and Garner's immediate supervisor suggesting to plaintiff
that she transfer out of the department she worked in with Garner;
(i) by Garner discussing his personal life, and trying to discuss plaintiff's
personal life with plaintiff despite her request that he not do so;
(j) by Garner copying his immediate supervisor and plaintiff's new
immediate supervisor on email messages unfairly critical of plaintiff;
(k) by Garner copying other individuals on emails unfairly critical of
plaintiff's conduct;
(l) by Garner sending plaintiff antagonizing messages and/or;
(m) by generally creating a work environment hostile to plaintiff, all in
substantial part because plaintiff opposed defendant's unlawful
employment practices.

First Amended Complaint, ¶ 18.

She also alleges DTNA discharged her "in substantial part because [she] filed a complaint

under ORS 659A." *Id*, ¶ 19.

### A. <u>Timeliness</u>

DTNA first seeks summary judgment against the allegations in ¶ 18(c)-(m) of the First

Amended Complaint on the basis that they are time-barred.

A complaint for unlawful retaliation under ORS 659A.030(f) must be filed within one

year after the occurrence of the unlawful employment practice. ORS 659A.875. "The

administrative charge requirement serves the important purposes of giving the charged party

notice of the claim and narrowing the issues for prompt adjudication." *B.K.B. v. Maui Police

Dep't*, 276 F3d 1091, 1099 (9th Cir 2002) (internal citations and quotations omitted).

The Ninth Circuit construes the language of EEOC charges "with utmost liberality since

they are made by those unschooled in the technicalities of formal pleading." *Kaplan v. Int'l

Alliance of Theatrical & Stage Employees*, 525 F2d 1354, 1359 (9th Cir 1975)*, abrogated on

other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F3d 931 (9th Cir

2001); *cf. Love v. Pullman Co.*, 404 US 522, 527 (1972) (stating that "technicalities are

particularly inappropriate in a statutory scheme [such as Title VII] in which laymen, unassisted

by trained lawyers, initiate the process").  "[T]he crucial element of a charge of discrimination is

the factual statement contained therein."  *Sanchez v. Standard Brands, Inc.*, 431 F2d 455, 462 (5th

Cir 1970); *accord Kaplan*, 525 F2d at 1359.  Allegations of discrimination not included in the

plaintiff's administrative charge "may not be considered by a federal court unless the new claims

are 'like or reasonably related to the allegations contained in the EEOC charge.'"  *Green v. Los*

*Angeles County Superintendent of Schs.*, 883 F2d 1472, 1475-76 (9th Cir 1989), quoting *Brown v.*

*Puget Sound Elec. Apprenticeship & Training Trust*, 732 F2d 726, 729 (9th Cir 1984); *see also*

*Anderson v. Reno*, 190 F3d 930, 935 (9th Cir 1999); *Sosa v. Hiraoka*, 920 F2d 1451, 1456 (9th Cir

1990).

　　　　A plaintiff's civil claims should be deemed reasonably related to allegations in the charge,

to the extent that those claims are consistent with the plaintiff's original theory of the case.

*B.K.B.*, 276 F3d at 1100, citing *EEOC v. Farmer Bros. Co.*, 31 F3d 891, 899 (1994).  "If the

charge itself is deficient in recording her theory of the case due to the negligence of an agency

representative who completes the charge form, then the plaintiff may present her pre-complaint

questionnaire as evidence that her claim for relief was properly exhausted."  *Id* at 1102.

　　　　DTNA argues that allegations in ¶ 18(c)-(m) are not included in or reasonably related to

Erickson's BOLI complaint.  However, the BOLI Complaint includes a reference to

ORS 659A.030(1)(b)(f) for retaliation claims under Oregon law.[5]  BOLI Complaint, p. 1.  In

---

[5] "It is an unlawful employment practice . . .  (f) For any person to discharge, expel or otherwise
discriminate against any other person because that other person has opposed any unlawful practice, or because that

(continued...)

addition, Erickson's attachment to the pre-complaint BOLI Questionnaire clearly includes the facts supporting the allegations of retaliation now at issue. Erickson contends that if the BOLI Complaint is deficient by not including her specific claims of retaliation, it was due to BOLI's negligence in transferring her allegations from the questionnaire into the complaint. Though Erickson does not specifically allege how BOLI failed to include the information, she need not do so given her pre-complaint BOLI Questionnaire. *B.K.B.*, 276 F3d at 1102.

Because the allegations in ¶ 18(c)-(m) are reasonably related to Erickson's BOLI Questionnaire, they are not time-barred.

### B. Retaliation Allegations

DTNA also seeks summary judgment against all of the retaliation allegations. The proper legal framework for determining whether employment discrimination claims under Oregon law survive summary judgment is the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973). *Snead v. Metro. Prop. & Cas. Ins.* Co., 237 F3d 1080, 1091 (9th Cir 2001), *cert denied*, 534 US 888 (2001) (the burden-shifting analysis is federal procedural law which applies to cases based on diversity jurisdiction).[6] A plaintiff must first establish a *prima facie* case by proving: "(1) that she was engaging in a protected activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link

---

[5](...continued)
other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

[6] Oregon has rejected the *McDonnell Douglas* burden-shifting framework. *Williams v. Freightliner,* LLC, 196 Or App 83, 89, 100 P3d 1117, 1121 (2004); *Calla v. Confederation of Or. Sch. Adm'rs*, 79 Or App 73, 77, 717 P2d 1252 (1986). However, *Snead* applies to all cases filed in the Ninth Circuit in which the choice between federal and state procedural law is presented, regardless of the source of the federal court's subject matter jurisdiction over the claim. *Dawson v. Entek Int'l.,* 630 F3d 928, 935 (9th Cir 2011).

between her activity and the employment decision." *Trent v. Valley Elec. Ass'n, Inc.*, 41 F3d

524, 526 (9th Cir 1994), *citing EEOC v. Hacienda Hotel*, 881 F2d 1504, 1513-14 (9th Cir 1989).

   If the plaintiff succeeds in establishing a *prima facie* case, then the burden of production

shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse

employment action.  If the employer does so, then the plaintiff then must prove that the

employer's proffered reason is a pretext for unlawful discrimination "either directly persuading

the court that a discriminatory reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of credence." *Aragon v. Republic

Silver State Disposal, Inc.*, 292 F3d 654, 659 (9th Cir 2002) (citations and quotations omitted).

This evidence must be both "specific and substantial" to overcome the employer's proffered

legitimate reasons.  *Id.*  Additionally, "when evidence to refute the defendant's legitimate

explanation is totally lacking, summary judgment is appropriate even though plaintiff may have

established a minimal prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 890-91 (9th Cir

1994).

   However, the *McDonnell Douglas* burden-shifting analysis does not apply "where the

plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469

US 111, 121 (1985); *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F3d 802, 812 (9th Cir

2004).  Direct evidence is "evidence of conduct or a statement by persons involved in the

decision-making process that may be viewed as directly reflecting the alleged the discriminatory

attitude." *Enlow*, 389 F3d at 812, quoting *Walton v. McDonnell Douglas Corp.*, 167 F3d 423,

426 (8th Cir 1999).  In short, it is "evidence which, if believed, proves the fact [of discriminatory

animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1220 (9th Cir 998), citing *Davis v. Chevron*, 14 F3d 1082, 1085 (5th Cir1994).

C. **Allegations of Adverse Employment Decisions**

1. **¶ 18(a):  Denial of Promotion**

DTNA does not dispute that a denial of promotion is an adverse employment action or that the required causal link exists.  Instead, it argues that the promotion allegedly denied to Erickson never materialized because of corporate downsizing.  However, as previously discussed, Erickson has presented evidence that Tolbert replaced her in the Extended Warranty Department, but was given a different title, different code, and a salary that was approximately 14% greater than her salary.  This is sufficient evidence to create a genuine issue of material fact to deny summary judgment to DTNA as to the denial of promotion allegation.

2. **¶ 18(b):  Forced Transfer**

A forced or constructive transfer may constitute a retaliatory action.  Though Erickson applied for her new position and also inquired about others, she has submitted evidence that Garner made the workplace sufficiently intolerable that she had no choice but to seek a transfer.  Thus, DTNA should be denied summary judgment against this allegation of retaliation.

3. **¶ 18(g):  Performance Reviews**

Erickson alleges that Garner reduced her performance rating from February 2007 to February 2008.  Undeserved performance ratings, if shown, can be considered an adverse employment action.  *See Yartzoff*, 809 F2d at 1376 (citation omitted), *cert denied*, 498 US 939 (1990).  However, "a performance evaluation that was mediocre (rather than 'sub-average') and that did not give rise to any further negative employment action did not violate Title VII." *Lyons*,

307 F3d at 1118, citing *Kortan v. California Youth Auth.*, 217 F3d 1104, 1112-13 (9th Cir 2000).

However, both Erickson's LEAD 2007 and LEAD 2008 scores were "Successful." Suppl. Eggum Decl., Ex. 30, p.5; Ex. 31, p. 1.  A successful rating is not "sub-average" and did not give rise to any further negative employment action.  Thus, the 2008 LEAD does not constitute an adverse employment action, and DTNA should be granted summary judgment against this allegation.

### 4. ¶ 18(m):  Retaliatory Hostile Work Environment

Erickson alleges in ¶ 18(m) that she suffered a hostile work environment after she opposed Garner's sexual harassment.  Conduct that is "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment" is actionable under Title VII if based on a protected status.  *Harris v. Forklift Systems*, 510 US 17, 21 (1993) (citation omitted).  A hostile working environment exists under Title VII "where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Pavon v. Swift Transp, Co.*, 192 F3d 902, 908 (9th Cir 1999) (citation omitted).

Erickson alleges that Garner's conduct made it very difficult for her to do her job, to the point that it was difficult to get up to go to work.  Erickson Depo., p. 120.  In December 2007, while waiting for HR to discipline Garner and his behavior to cease, she took time off work to avoid interacting with him.  Ford-Chilton Decl., Ex. 10, p. 1.

DTNA argues that Erickson cannot prevail on this claim because she was undeterred in making her sexual harassment complaint, citing *Steele v. Mayoral*, 231 Or App 603, 220 P3d

761, 770 (2009).  In *Steele*, the plaintiff made a report regarding harassment, and the court

concluded that "[u]nder the circumstances, a reasonable employee would not be deterred from

making a complaint."  *Id* at 618, citing *Samoza v. Univ. of Denver*, 513 F3d 1206, 1214 (10th Cir

2008) ("The fact that an employee continues to be undeterred in his or her pursuit of a remedy . .

. may shed light as to whether the actions are sufficiently material and adverse to be

actionable.").  However, the circumstances in *Steele* included the employer shielding the plaintiff

from further contact with the harasser after she complained.  In contrast, Erickson complained to

Knobeloch on October 31, 2007, worked with Garner through December 2007, and then in

January 2008 completed a required two-week transition with continued contact with Garner.

DTNA did not shield her from Garner or his behavior.  In addition, Knobeloch was instrumental

in persuading Erickson not to complain to HR.  Under those circumstances, this court cannot

definitively conclude that a reasonable person would be undeterred from making a complaint.

Thus, DTNA's motion for summary judgment against this allegation should be denied.

### 5. ¶ 18(c)-(f), (h)-(l):  Remaining Retaliation Allegations

Erickson alleges a number of other retaliatory acts by Garner based on unfairly criticizing,

micromanaging and monitoring her performance, actively pursuing her transfer, discussing their

personal lives, copying others on emails unfairly critical of her, and sending antagonizing

messages.  Firs Amended Complaint, ¶ 18(c)-(f), (h)- (l).

DTNA argues these allegations do not constitute unlawful retaliatory conduct.  "An

action is cognizable as an adverse employment action if it is reasonably likely to deter employees

from engaging in protected activity."  *Ray v. Henderson*, 217 F3d 1234, 1241, 1243 (9th Cir

2000).  Accordingly, the category of potential retaliatory acts is broad.  *Strother v. S. Cal.*

*Permanente Med. Group*, 79 F3d 859, 869 (9th Cir 1996) (imposition of more burdensome work

schedule); *Wideman v. Wal-Mart*, 141 F3d 1453,1456 (11th Cir 1998) (making negative

comments about the plaintiff), cited by *Ray*, 217 F3d at 1241-42.

In contrast, "petty slights, minor annoyances, and simple lack of good manners" do not

constitute retaliatory conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 US 53, 68 (2006).

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation

that produces an injury or harm." *Id* at 67; *Steele*, 231 Or App at 616, 220 P3d at 771. Conduct

such as unruly behavior during a meeting, derogatory emails, or an angry outburst and ostracism

do not rise to that level. *Somoza*, 513 F3d at 1214–15. "Potentially adverse employment actions

that are not final or lasting are insufficient to constitute actionable adverse actions." *Marrazzo v.

Leavitt*, 719 F Supp2d 1297, 1307 (D Or 2010), citing *Brooks v. City of San Mateo*, 229 F3d 917,

930 (9th Cir 2000).

Allegations that Garner micromanaged Erickson, excessively monitored her, inquired

about other positions, suggested that she transfer, discussed their personal lives, and sent her

antagonizing messages (¶ 18(d)-(f), (h)-(i), & (l)) do not rise to the level of injury or harm

sufficient to qualify as adverse employment actions. Moreover, Erickson has not alleged that

they had any final or lasting impact. Thus, DTNA's motion for summary judgment should be

granted as to these allegations (although they may be admissible as evidence of a hostile work

environment).

However, unfairly criticizing Erickson and copying immediate supervisors, her new

supervisor, and others on unfairly critical emails about her ( ¶ 18(c), (j), and (k)), are more than

"petty slights, minor annoyances, and simple lack of good manners." *Burlington N. & Sante Fe*

*Ry. Co*., 548 US at 68.  These actions have the potential to – and allegedly did – influence her employment by unfairly casting her in a negative light and creating a lasting impact on her career. Because such actions are reasonably likely to deter a person from making a complaint, DTNA's motion for summary judgment should be denied as to these allegations.

### 6. ¶ 19:  Discharge

Erickson alleges that a substantial factor in her discharge on March 20, 2009, was the filing of her BOLI complaint about six months earlier in September 2008.  "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  *Cohen v. Fred Meyer, Inc*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted).  "[A] *prima facie* case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory [activity]."  *Yartzoff*, 809 F2d at 1376.  The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the plaintiff had engaged in the protected activity."  *Cohen*, 686 F2d at 796.  The Ninth Circuit has held that "when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred."  *Passantino v. Johnson & Johnson Consumer Prods., Inc*, 212 F3d 493, 507 (9th Cir 2000) (citing cases); *see Villiarimo v. Aloha Island Air,* 281 F3d, 1054, 1065 (9th Cir 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.").

Epley, who was one of the decision-makers, concluded that Erickson was a "candidate for ISP based on her poor LEAD 2009 review rating and input from Scasny about [Erickson's] work performance." Epley Decl., ¶¶ 4, 7. Scasny recommended Erickson as the best candidate in the MDI group for layoff. Scasny Decl., ¶ 10. Well before the LEAD 2009 review, Erickson had told Scasny about her complaint to HR, causing Scasny to contact HR for instruction and her supervisor, Bruce Luscomb, for feedback. *Id*, ¶ 11. Scasny's knowledge of Erickson's HR complaint, combined with her recommendation to Epley to discharge Erickson, are sufficient to create a causal link between Erickson's protected activity and her discharge.

Even if Erickson has met her burden for a *prima facie* case, DTNA submits that it had a nondiscriminatory reason to discharge Erickson, namely its plan to reduce manpower and Erickson's selection based on her poor performance. Tam, the HR specialist, explained that, as confirmed by his Adverse Impact Follow-Up Analysis, the reason for selecting Erickson for layoff was her lower performance figures. Tam Decl., ¶ 7. If another analyst had had a lower performance, he "would have questioned" the decision to discharge Erickson. Tam Depo., p. 18.

Erickson responds that this reason is merely pretextual because DTNA retained all other employees, including one whose statistical performance was inferior to hers. Scasny Depo., pp. 70; Scasny Decl., Ex. 19, pp. 5, 7, 9. She also questions whether objective criteria were used when making the termination decision based on McWilliams' admission that he did not use objective criteria when making the decision about whom to discharge. McWilliams Depo., p. 28.

However, statistics alone do not tell the whole story. Erickson's LEAD 2009 review listed many performance deficiencies based on Scasny's observations. Scasny Decl., Ex. 20. It states that Erickson "does the minimum," "is not proactive," does "limited problem solving to

identify a solution"leading to a decrease in average acceptance, "lacks attention to detail and is not consistent with following procedures and processes," "chooses not to be accountable" for following procedures, "is capable of doing much more," lacks leadership qualities, and has a "steady decline in her performance." *Id*. As a result, she gave Erickson an unfavorable overall performance rating of "inconsistent." *Id*, ¶ 7. Scasny also reported to Epley that Erickson was not properly managing three large accounts. *Id*, ¶ 10. Scasny was aware of Erickson's complaint about Garner, but Garner worked in a different department. The record reveals no motive for Scasny to criticize Erickson based on her sexual harassment accusation against Garner. Moreover, the termination decision was made by Epley with input not only from Scasny, but also from McWilliams. HR then validated that decision by taking the additional step of evaluating Erickson's selection for termination once it discovered she had filed a BOLI complaint. Tam Decl., ¶¶ 7-8, Ex. 22. The decision to terminate Erickson was also supported by McWilliams who observed her poor personal work habits. McWilliams Decl., ¶¶ 4-9. Thus, DTNA evaluated Erickson's poor performance overall, rather than just rely on the LEAD 2009 numbers.

Erickson cites *Dawson*, 630 F3d at 937, to argue that "temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." However, in *Dawson*, the protected activity occurred at most two days before the discharge, and the treatment of plaintiff was a topic during both the protected activity and the discharge. The court concluded that "the gravity of Dawson's complaints coupled with the time frame are such that a reasonable trier of fact could find in favor of Dawson on his retaliation claim." *Id*. The facts are substantially different here. Erickson's protected activity occurred in September 2008, six months prior to her discharge. In addition, the reasons

for discharge was her poor performance and the need of DTNA to downsize. There is no

evidence that her protected activity was not a topic of discussion.

This court concludes that Erickson has not presented specific and substantial evidence of

pretext to sufficiently rebut DTNA's nondiscriminatory reason for her discharge. Thus, DTNA

should be granted summary judgment as to her retaliatory discharge claim.

### III. <u>Punitive Damages</u>

"[F]or an employer to be liable for punitive damages in a discrimination suit, the plaintiff

must show: (1) that the employer acted with the requisite mental intent, *i.e.* the employer knew it

was acting in violation of the law; and (2) that the employees who discriminated against the

plaintiff were managerial agents of the employer acting within the scope of their employment."

*Jernigan*, 489 F Supp2d at 1205. *Jernigan* determined that a question of fact existed as to

whether an employer acted with reckless disregard when evidence revealed that it had failed to

enforce the policies after repeated complaints were made.

Erickson has alleged and presented evidence that Garner did not receive formal discipline

for sexual harassment for up to two months after her first complaint of sexual harassment to

management. Garner continued to harass her throughout that time and even after he was no

longer her supervisor. This conduct could reasonably be construed as amounting to reckless

disregard. Thus, DTNA's motion for summary judgment as to punitive damages should be

denied.

///

///

///

38 - FINDINGS AND RECOMMENDATIONS

## RECOMMENDATIONS

DTNA's Motion for Summary Judgment (docket # 47) and Supplemental Motion for Summary Judgment (docket # 70) should be GRANTED in part as to Erickson's Second Claim for retaliation based on her discharge (¶ 19), micromanaging (¶ 18(d)), excessive monitoring (¶ 18(e)), inquiring about transfer (¶ 18(f)), suggesting that she transfer (¶ 18(h)), reduced performance ratings (¶ 18(g)), discussions of personal life (¶ 18(i)), and antagonizing emails (¶ 18(l), and otherwise should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due August 8, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20th day of July, 2011.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge